# United States Court of Appeals
## For The
## Third Circuit
### Nos. 15-2291, 15-2230
_____

IN RE NATIONAL FOOTBALL LEAGUE PLAYERS CONCUSSION INJURY LITIGATION

JIMMIE H. JONES; RICKY RAY; JESSE SOLOMON,
*APPELLANTS IN NO. 15-2291*

CURTIS L. ANDERSON,
*APPELLANT IN NO. 15-2230*

_____

APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## REPLY BRIEF OF APPELLANTS

Cyril V. Smith
ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202
(410) 539-5526

Dwight P. Bostwick, Esquire
ZUCKERMAN SPAEDER LLP
1800 M Street, NW, Suite 1000
Washington, DC 20036-5802
(202) 778-1800

*Attorneys for Appellants Jimmie H. Jones; Ricky Ray; and Jesse Solomon*

George W. Cochran, Esquire
1385 Russell Drive
Streetsboro, Ohio 44241
(330) 626-5600

*Attorney for Appellant Curtis L. Anderson*

*(Additional Counsel listed on inside cover)*

Ramya Kasturi, Esquire
ZUCKERMAN SPAEDER LLP
399 Park Avenue, 14th Floor
New York, NY 10022
(212) 704-9600

*Attorneys for Appellants Jimmie H. Jones; Ricky Ray; and Jesse Solomon*

Dated:  October 7, 2015

# **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS ................................................................................ i

TABLE OF AUTHORITIES .......................................................................... ii

GLOSSARY OF CITATIONS ...................................................................... iv

INTRODUCTION ......................................................................................... 1

I.     INCLUDING A CTE BENEFIT FOR PLAYERS WHO DIED BEFORE APPROVAL, BUT NOT FOR PLAYERS WHO DEVELOP CTE AFTERWARDS, RESULTED FROM A STRUCTURE FAVORING CURRENT CLAIMANTS. ....................................................................... 4

II.    CLASS COUNSEL *CREATED* A CONFLICT BY SELECTING A REPRESENTATIVE WHO DECLINED TO REPRESENT THE INTERESTS OF FORMER PLAYERS AT RISK FOR CTE, REQUIRING THE APPOINTMENT OF NEW REPRESENTATIVES. ....................... 11

III.   THE CLASS RESPONSE TO THE SETTLEMENT IS NOT AN ENDORSEMENT ........................................................ 15

IV.   THE SETTLEMENT GENERALLY COMPENSATES *DISEASES* LINKED TO REPEATED HEAD TRAUMA, BUT NOT THE DISEASE MOSTLY CLOSELY LINKED TO IT, WHICH IS CTE. ................................................. 17

V.    THE COURT SHOULD NOT APPROVE AN UNFAIR AND INADEQUATE SETTLEMENT BECAUSE IT IS SUPPOSEDLY "BETTER THAN NOTHING." .............................. 21

CONCLUSION ............................................................................................ 25

CERTIFICATE OF BAR MEMBERSHIP .................................................. 27

CERTIFICATE OF COMPLIANCE ........................................................... 28

CERTIFICATE OF SERVICE ..................................................................... 29

# TABLE OF AUTHORITIES

**Page**

## CASES

*Allis-Chalmers v. Lueck*,
  471 U.S. 202 (1985) ................................................................................. 23

*Caterpillar Inc. v. Williams*,
  482 U.S. 386 (1987) ................................................................................. 22

*Dewey v. Volkswagen Aktiengesellschaft*,
  681 F.3d 170, 184 (3d Cir. 2012) ............................................................. 14

*Georgine v. Amchem Prods., Inc.*,
  83 F.3d 610 (3d Cir. 1996) ....................................................................... 12

*IBEW v. Hechler*,
  481 U.S. 851 (1987) ................................................................................. 23

*In re Cmty. Bank of N. Va.*,
  418 F.3d 277 (3d Cir. 2005) ..................................................................... 14

*In re Comty. Bank of N. Va. Mortg. Lending Practices Litig.*,
  795 F.3d 380 (3d Cir. 2015) ..................................................................... 14

*In re Insurance Brokerage Antitrust Litigation*,
  579 F.3d 241 (3d Cir. 2009) ..................................................................... 10

*Kline v. Sec. Guards, Inc.*,
  386 F.3d 246 (3d Cir. 2004) ..................................................................... 24

*Lingle v. Norge Div. of Magic Chef, Inc.*,
  486 U.S. 399 (1988) ................................................................................. 25

*Livadas v. Bradshaw*,
  512 U.S. 107 (1994) ................................................................................. 24

*N.J. Carpenters v. Tishman Constr. Corp.*,
  760 F.3d 297 (3d Cir. 2014) .............................................................. 21, 22

*Powers v. Cottrell, Inc.*,
  728 F.3d 509 (6th Cir. 2013) .................................................................... 23

*Trans Penn Wax Corp. v. McCandless*,
   50 F.3d 217 (3d Cir. 1995) ......................................................................... 24

*United Steelworkers v. Rawson*,
   495 U.S. 362 (1990) ................................................................................... 23

**STATUTES**

29 U.S.C. § 185(a) ................................................................................... 22, 23

# GLOSSARY OF CITATIONS

"A.___" refers to the 16 volume Joint Appendix filed in all consolidated appeals.

Armstrong Opening Br. refers to the brief filed by appellants in Nos. 15-2272 & 15-2294.

"CCBR" refers to the brief filed by Class Counsel (Consolidated Brief for Class Plaintiffs-Appellees) in all consolidated appeals.

"ECF No. ___" refers to the docket number of a filing in Case No. 12-md-2323.

"Fanceca Opening Br." refers to the brief filed by Appellants in No. 15-2304.

"Jones Opening Br." refers to the brief filed by Appellants in No. 15-2291.

"NFLBR" refers to the brief filed by the National Football League and NFL Properties, LLC in all consolidated appeals.

**INTRODUCTION**

There is a gaping hole at the middle of the settlement, affecting every NFL retiree diagnosed with CTE after settlement approval, that neither the NFL nor Class Counsel can explain away or paper over with references to a dementia benefit that is both far smaller and unavailable to many ex-players with CTE. The number of former players who will develop CTE is likely to be very large, and it already includes Appellant Jesse Solomon, diagnosed with likely CTE five years ago—a diagnosis concurred in by an NFL-chosen doctor.

Class Counsel's brief chooses to begin by vividly portraying the dismay that former players experienced upon learning that the NFL "had put their lives at risk" while the League's representatives publicly dismissed scientific evidence of that risk. CCBR 1. The question is whether former players will soon experience equal dismay over a settlement that fails to remedy the main risk of head injury from playing football (CTE), and the dismissal of scientific evidence about CTE by the lawyers purporting to represent them. To prevent that, this Court must step in to ensure that former players with future claims, many of whom *will develop* CTE, are adequately represented in settlement.

This Court cannot assess the substantive fairness of this settlement without evaluating the process that produced it.  This Court's ordinary tools for judging the fairness of a class action settlement—the *Girsch* and *Prudential* factors—assume adequate representation; they are not tools for diagnosing intra-class conflict or inadequate subclass representation.  The settlement process here began with a decision by lawyers appointed solely to manage consolidated pretrial litigation (the PSC), who had neither sought nor been approved to represent a class, to feel out the NFL about what injuries it was willing to compensate.  The PSC entered mediation knowing that it could not achieve a quick settlement that provided compensation for CTE, even though CTE was the main impetus for the litigation.  *See, e.g.*, A.2236-37 (former SeegerWeiss LLP webpage).  The PSC forged ahead with a settlement that releases all CTE claims, but compensates players who develop CTE in the future only if they develop a particular symptom (mild or moderate dementia), while compensating other neurological diseases much less closely associated with head injuries regardless of particular symptoms.

The process was flawed from the start.  The PSC had a financial interest in a quick settlement, and the subclass representative it later chose for future claimants had agreed in advance to support a deal the PSC had

already announced. The changes in the settlement the District Court insisted on (like removing caps on the benefits fund and testing program) reflect inadequate representation of future claimants in the PSC's *ad hoc* process. The District Court acted commendably in identifying those flaws in the settlement and demanding that they be corrected, but it stopped short of fulfilling its fiduciary obligations to the future claimants.

The District Court never fixed the structural cause: inadequate representation of future claimants. Nor did it fix the principal consequence of that structural defect: the release of future CTE claims in exchange for dementia benefits only, unlike other diseases, for which benefits are paid regardless of neurocognitive impairment.

Class Counsel ask rhetorically (CCBR 49) why it is not enough that former players who oppose the settlement could have opted out. But the right to opt out exists alongside—not in place of—the requirement of adequate representation. More to the point, it was the 5,000 or so former players who filed those lawsuits consolidated in the MDL and collectively gave the PSC the cards to play in settlement discussions, and it is impossible to understand why Class Counsel's brief declares that those suits "brought no relief." CCBR 1. Settling the vast majority of claims of the entire class allows the NFL to concentrate its essentially infinite resources on defeating

any opt-out claims by attrition and exhaustion. The real question is why the strength of the class was not used to pursue the interests of all of the former players—including those like Mr. Solomon, already diagnosed by the NFL with "probable" CTE—who look at the mounting evidence of the effects of CTE and its prevalence among former NFL players with justifiable alarm.

## I.     INCLUDING A CTE BENEFIT FOR PLAYERS WHO DIED BEFORE APPROVAL, BUT NOT FOR PLAYERS WHO DEVELOP CTE AFTERWARDS, RESULTED FROM A STRUCTURE FAVORING CURRENT CLAIMANTS.

As Class Counsel describe the negotiations, "the NFL Parties held firm in their willingness to compensate only objectively verifiable and serious neurocognitive and neuromuscular injuries supported by the available science," CCBR 12; *accord id.* at 13, or at least such was the reason they gave for refusing compensation for CTE. Yet the settlement includes a benefit for players who died of CTE before the final approval date, regardless of any "neurocognitive and neuromuscular symptoms" the player may have experienced. *See* A.2271 (describing stages of CTE); A.2956 (Stern Decl. ¶ 32) (noting that many confirmed cases of CTE did not show dementia prior to death). If the parties had wanted to provide a benefit limited to former players who had mild or moderate dementia, but who lacked an opportunity to obtain a diagnosis meeting the unique criteria for

the settlement's future dementia benefit, they could easily have done so.[1]
The missed opportunity to qualify for a mild or moderate dementia benefit
cannot explain why the settlement includes a benefit for CTE, regardless of
evidence of dementia.[2] The CTE benefit is also significantly larger than the
benefits for dementia, seemingly in keeping with the general calibration of
benefits for different diseases on the basis of a judgment about their overall
severity.

---

[1] The settlement relaxes the standard for establishing compensable dementia
(that is, Level 1.5 and Level 2 Neurocognitive Impairment) for players who
died before the effective date, which would allow recovery for those
conditions "based on evaluation and evidence generally consistent with the
diagnostic criteria" applicable to such claims by living former players.
A.5695-97 (Am. Settlement Agreement, Ex. 1 at 2-4). Moreover, if the goal
were to assure that the families of deceased former players were
compensated for dementia symptoms for which the deceased former player
could no longer be tested, the settlement could have further accepted less
rigorous proof of dementia, or it could have accepted evidence of CTE at
autopsy as corroborating anecdotal or incomplete medical evidence of
dementia. The settlement could also have adopted a more conventional
standard for dementia, at least for diagnoses preceding the settlement. *See*
A.4422, A.4475, A.4620, A.4754, A.4768, A.4927, A.4953, A.5004,
A.5058-59 (declarations of numerous distinguished experts in neuroscience
expressing unfamiliarity with the particular diagnostic criteria adopted for
purposes of the settlement); A.2962-65 (Stern Decl.) (discussing
unconventional settlement criteria for neurocognitive impairment). Instead,
the settlement allows the families of deceased players to bring claims for
dementia as defined in the settlement, *and for CTE*.

[2] At the fairness hearing, Class Counsel argued that "[t]his settlement does
not compensate CTE, it compensates the injuries and diseases, the most
significant ones that we were able to agree upon." A.5374. But for those
who died before the approval date, the settlement plainly *does* compensate
CTE.

The difference between the CTE benefit and the dementia benefit cannot be explained by the fact that a former player who died of CTE may have suffered from dementia for a number of years.  That is equally true of a player who is only formally diagnosed with a level of dementia qualifying for benefits under the settlement now, even though the player has actually suffered those symptoms (and others) for many years.  To be concrete:

- A player who died of CTE minutes before the settlement gets a CTE benefit, regardless of the extent of his dementia (if any), but a player who dies of CTE today before establishing that he has dementia gets nothing.

- A player who likewise died of CTE immediately before the settlement, but suffered from dementia for ten years before his death, gets the larger CTE benefit.

- But a player who develops CTE (confirmed by testing or autopsy) after the settlement who had dementia for ten years or more gets only the lower dementia benefit.[3]

The real explanation for the CTE benefit for players who died before the settlement is apparent from Class Counsel's brief:  the families of the players who died of CTE would never have agreed to a settlement without a

_____

[3] Denying benefits even for CTE established by an autopsy confirms that the settlement's treatment of CTE is not based on diagnostic uncertainties, or uncertainties about whether particular mood or behavioral symptoms are attributable to CTE.  *See* CCBR 31 n.8.  And the settlement allows benefits for Alzheimer's disease even though Alzheimer's, like CTE, can be definitively diagnosed only by autopsy and imaging techniques similar to those used to diagnose Alzheimer's *inter vivos* are already in development for CTE.

CTE benefit, and the PSC lawyers could not settle the case without them. *See* CCBR 14, 84. The players whose deaths brought the danger of CTE to light, especially David Duerson who shot himself in the heart rather than in the head to prove this very point (as well as Junior Seau who did the same after the suits were filed) were martyrs to the cause of protecting future players from the NFL's "industrial disease." Moreover, lawyers and firms who represented the families of players who had died of CTE (some of whom may have been members of the PSC) would also have opposed a settlement dismissing and releasing CTE claims without compensation (and therefore without a fee). The PSC lawyers understood, and presumably persuaded the NFL, that a settlement failing to compensate cases of CTE that had *already* been confirmed by autopsy would fail. The parties agreed to compensation for *CTE* at a level that was commensurate with the general severity of the disease in comparison to the other diseases (Amyotrophic Lateral Sclerosis (ALS), Parkinson's, Alzheimer's) that the NFL was willing to compensate in addition to compensating the symptom of dementia.

Unlike the already-quantifiable current CTE claimants, the undoubtedly much larger number of future claimants lost out. The inherent problem is that people exposed to a cause of likely injury, whether the cause is asbestos or repeated head trauma, may or may not develop symptoms. It

is natural for human beings faced with the prospect of a horrifying, irreversible disease like CTE to underestimate its likelihood. Optimism or hope borne of inherent uncertainty explains why any given future claimant will be less insistent on benefits than a current claimant whose injury is already manifest. That is why a settlement providing different benefits to future claimants than to present claimants requires especially rigorous scrutiny, to ensure that the future claimants were fully represented in the negotiation process, lest the value of the release of their future claims be traded for the benefit of others.

The District Court had ample reason to doubt that future claimants were adequately protected. The cap on the Monetary Award Fund meant there was a risk that benefits might run out for future claimants, although all of the current claimants would be fully paid. Yet counsel for the subclass agreed to that term, apparently with the concurrence of both the original subclass representative, and Shawn Wooden, his successor (although Mr. Wooden seems to have been bound already by the term sheet including the cap). Similarly, the subclass representatives seemingly agreed to a cap on the Baseline Assessment Program. It is impossible to have confidence that the interests of future claimants were forcefully protected with regard to CTE when they were plainly not protected in other ways.

To be sure, client participation and control is sometimes a fiction in class actions, especially when the individual stakes are small and only the aggregate interest is worth pursuing. In this case, however, over 5,000 former players had filed suit, most of them asserting claims based on the risk of future harm. Each individual case potentially involved grave consequences and monetary damages in the millions of dollars. The former players were college-educated, experienced in public speaking and communications, and included successful leaders in business and other fields. Some of the former players had been involved in associations of former players or had served as team representatives during their playing careers, and could readily have served as effective advocates for future claimants' interests. Against that background, the PSC's choice of a one-year NFL player who had not filed his own lawsuit (and was therefore not even part of the MDL) as the only representative of future claimants when the parties negotiated the dispositive terms of the settlement is hard to understand.

There is also no denying that the PSC lawyers had an interest in reaching an early settlement that would produce class-wide fees rather than simply resolving common issues as MDL counsel, and therefore an interest on reaching a settlement on terms that the NFL could accept without the

additional pressure from discovery into the NFL's years of CTE-denial. That aligned the PSC lawyers more closely with *current* claimants understandably impatient for compensation, than with *future* claimants. The decision to negotiate for a separate "clear sailing" fee provision rather than drawing fees from an explicit common fund created to pay the settlement strengthened that alignment, because it allowed the lawyers, like the current claimants, to be paid up front, and regardless of how much eventually was paid to future claimants.[4]

A reviewing court, and even a mediator overseeing the negotiations, cannot know whether a party to a settlement pushed as hard as it could or sacrificed the interests of some clients for the interests of others. Those compromises are generally unspoken, and—when they reflect the subtle influence of conflicting interests—may even be unconscious. That is why the foundation of a class-wide settlement, especially for a settlement-only class, must be the rigorous provision of adequate representation for each sub-class.

---

[4] Class Counsel fail to acknowledge that the fee the NFL agreed not to oppose in the clear sailing provision must be treated as having been carved out of the total payment the NFL was willing to make (to the former players or their counsel) to settle the case. *See* Jones Opening Br. 47-50. Class Counsel cite, for example, *In re Insurance Brokerage Antitrust Litigation*, 579 F.3d 241, 283 (3d Cir. 2009), where the Court combined the separate fee with the class recovery as if it were a single common fund for purposes of assessing reasonableness. CCBR 94 n.30.

**II.    CLASS COUNSEL *CREATED* A CONFLICT BY SELECTING A REPRESENTATIVE WHO DECLINED TO REPRESENT THE INTERESTS OF FORMER PLAYERS AT RISK FOR CTE, REQUIRING THE APPOINTMENT OF NEW REPRESENTATIVES.**

Class Counsel insist that the informal designation of a lawyer and a representative for a subclass of former players who had not yet received a "Qualifying Diagnosis" necessarily assured adequate representation of future claimants.  CCBR 35.  Their brief quotes the District Court's conclusion that "*the best Subclass Representative for CTE is someone in Shawn Wooden's position*," CCBR 66 (quoting A.95 and adding emphasis), i.e., "one who alleges exposure to the traumatic head impacts that cause CTE and who has an incentive to negotiate for varied and generous future awards in light of the current uncertainty in his diagnosis." *Id.* at 65 (quoting A.95).

Although it may be true enough *in principle* that a former player who knows he has been exposed to head trauma has an incentive to seek benefits for the harm that head trauma may cause, including CTE, the issue is not the theoretical adequacy of a hypothetical subclass representative, but the actual adequacy of the real person who was chosen.  Determinations of adequacy under Rule 23 depend on the actual subclass representative.

Class Counsel fail to acknowledge, much less resolve, the causes for concern about Mr. Wooden's adequacy.  *First*, he expressly, repeatedly, and

intentionally excluded CTE from the list of diseases he was at risk of developing as a result of head trauma sustained in the NFL. A.1126 (allegations of the class action complaint regarding Mr. Wooden); A.3823 (Wooden Dec. in support of final approval). *See* Jones Opening Br. 17-18; Fanceca Opening Br. 30-33; Armstrong Opening Br. 42-44.[5] Even if Mr. Wooden is objectively at risk of developing CTE, his refusal to acknowledge that risk makes him a completely inadequate representative of class members who are at risk and seek compensation for CTE. The purpose of a subclass is to provide "structural protections to assure that differently situated plaintiffs negotiate for their own unique interests." *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 631 (3d Cir. 1996). A subclass representative who will negotiate only for the interests of part of the subclass cannot represent the entire subclass.

---

[5] The District Court erred in looking to Mr. Wooden's authorization of a *complaint* seeking relief for CTE to establish adequacy of representation, A.94-95, when his declaration and the related allegations specifically show that he would not advocate (and denied an interest in) such relief on behalf of the subclass. *See* Armstrong Opening Br. 45 (citing cases). What matters for adequacy of representation is what the class complaint said about *Mr. Wooden*, not what it said about CTE *in general*. Class Counsel's own discussion of *In re Diet Drugs Products Liability Litigation*, 282 F.3d 220 (3d Cir. 2002), shows that it has no bearing on the adequacy-of-representation problem here. The problem here is not an inherent conflict within the future claimant subclass, but rather the PSC's choice of an inadequate subclass representative for settlement discussions without judicial oversight. *See* CCBR 59-63.

*Second*, Mr. Wooden's exclusion of CTE is explained by the way he became a subclass representative.  The PSC originally designated a one-year NFL player who had not filed a lawsuit to represent the future claimant subclass, but that individual died shortly after the parties announced the settlement term sheet.  A.3902.

Following the original subclass representative's death, Mr. Wooden's lawyer advised him about "the negotiations between the Plaintiffs and the NFL Parties regarding the Settlement Agreement and exhibits."  *Id.*  On October 16, 2013, the PSC lawyer designated to represent the subclass met with Mr. Wooden in his Philadelphia office.  After discussing the settlement, Mr. Wooden "agreed to participate as the representative plaintiff of Subclass 1, and he supported the settlement."  *Id.*  Thus, Mr. Wooden began his role as subclass representative *already committed to* and *already bound by* the settlement term sheet, providing CTE benefits for current claimants, but not for the future claimants whom he had agreed to represent.  Mr. Wooden's Declaration supporting approval of the settlement matches the term sheet he already supported (benefits for dementia, ALS, Alzheimer's, and Parkinson's), not the full interests of his future claimant subclass.[6]

---

[6] The District Court recognized that Mr. Wooden would not be an adequate class representative if he did not believe he was "at risk of developing CTE." A.94.

13

Selecting a subclass representative who would not advocate for CTE benefits created a needless conflict between Mr. Wooden's interest in maximizing benefits for the risks he listed, and the interest of subclass members seeking coverage of CTE—a conflict that affected the allocation of remedies and is therefore plainly "fundamental." *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 184, 187-88 (3d Cir. 2012) (class representatives who all belonged to reimbursement group could not represent residual group); *see also In re Comty. Bank of N. Va. Mortg. Lending Practices Litig.*, 795 F.3d 380, 394 (3d Cir. 2015) (distinguishing litigation subclasses which "can assert all of their available claims" and "at least in theory, recover all of their damages without impacting the recovery of any other class members" from settlement subclasses "jockeying for pieces of a limited settlement pie."). Put differently, selecting a subclass representative committed to a settlement excluding relief for future cases of CTE is not meaningful or adequate representation of subclass members who seek such relief. *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 303-04 (3d Cir. 2005) (representatives with time-barred claims could not represent class members with timely claims). The need for representation of subclass claims for future CTE benefits does not mean that the future claimant subclass had to be subdivided. The remedy could involve either appointing

additional subclass representatives to advocate specifically for the subclass members concerned about CTE, or substituting one or more former players for Mr. Wooden to represent the full range of interests of the subclass. Failing to do either was an abuse of discretion.

## III.    THE CLASS RESPONSE TO THE SETTLEMENT IS NOT AN ENDORSEMENT.

Class Counsel are right about this much:  former NFL players are a cohesive group for whom loyalty counts.  CCBR 42.  That helps explain why many former players are reluctant to challenge a settlement that they recognize will provide real benefits to current claimants who need them, even if the settlement is unfair to them and to others.[7]  Class Counsel has not hesitated to exploit the impulse to solidarity, publicly condemning former players challenging the settlement immediately after approval as "selfish" in

---

[7] Class Counsel points to the decision of David Duerson's family not to appeal settlement approval, after objecting to it below because it fails to provide compensation for future CTE claims.  CCBR 45 n.12.  A statement on their law firm's website indicates that the Duerson family chose not to appeal to "let the current retirees who are in dire straits receive, finally, some semblance of dignity and an improved quality of life" by obtaining benefits. http://www.corboydemetrio.com/news-551.html.  But the decision not to appeal does not imply a Duerson family seal of approval for the exclusion of CTE benefits for future claimants.  The Duerson family made its position on that issue clear at the fairness hearing—unequivocally asking the District Court to deny approval.  A.5459-61.  The Duerson family had no reason (and perhaps no legal basis) to appeal because it was not aggrieved by the denial of CTE benefits to future claimants; the settlement *does* provide a CTE benefit to them and to the families of other players who died before the final approval date.

a widely-distributed news article, and invoking the emotionally-charged image of class representative Kevin Turner, who suffers from ALS, as a reason to allow the settlement to go into effect. Steven Ginsburg, *Lawyer in NFL Concussion Deal Says An Appeal Would Be 'Selfish*,*' Reuters News (Apr. 23, 2015 8:38 AM). Class Counsel is, of course, entitled to defend the settlement, including in a public forum, but the implicit and explicit attacks on objectors—and the impulse towards loyalty to former teammates who will benefit from the settlement despite its inadequacies—go a long way to explain why many players are content to remain on the sidelines of this appeal.[8]

Class Counsel tout the number of class members (7,400) who have signed up to receive information about benefits under the settlement. CCBR 19. But that statistic proves nothing about the extent of class support for the settlement's terms. Of course, former players are interested in whatever benefits may be available: that says nothing about whether those class

---

[8] Class Counsel chide some objectors for not filing suit against the NFL (CCBR 47), but the objectors, as class members, are bound by the release and covenant not to sue in the settlement and by principles of claim preclusion from the judgments dismissing their claims in the MDL proceeding. Under the certification procedure the District Court followed, a putative class member had to choose between trying to improve the settlement by objecting, or opting out instead. The District Court refused to provide an opportunity to opt-out after final approval of the settlement, as authorized by Fed. R. Civ. P. 23(e)(4). A.188-89.

members would prefer a fair settlement that protects the interests of future CTE claimants. Rather than pointing to any evidence of actual support for the settlement, and in particular its treatment of future CTE claims, Class Counsel purports to find a "loud[] and clear[]" endorsement in the more than 400 former players who objected or opted out, on the theory that anyone who did not object or opt out necessarily "supports" the terms of the settlement. CCBR 45; *see id.* at 48 ("overwhelming evidence that the class supports the settlement," citing nothing). It is always hazardous to attribute meaning to inaction, and particularly so when the class notices were less than clear about the absence of benefits for CTE for future claimants. *See* Jones Opening Br. 29 n.14. Far more class members have made the substantial effort to object to the settlement than to support it on the merits.

## IV. THE SETTLEMENT GENERALLY COMPENSATES *DISEASES* LINKED TO REPEATED HEAD TRAUMA, BUT NOT THE DISEASE MOSTLY CLOSELY LINKED TO IT, WHICH IS CTE.

Seeking to justify dementia benefits for future claimants instead of CTE benefits, the NFL asserts that the settlement "compensates manifested neurocognitive and neuromuscular impairments, not underlying pathologies." NFLBR 63; *accord id.* at 18. This is the main reason offered by the settling parties to defend their disparate treatment of pre- and post-settlement CTE. But it cannot withstand scrutiny.

CTE, like Alzheimer's, Parkinson's, and ALS, is *itself* a disease, or an "underlying pathology." Dementia, by contrast, may be a symptom of many diseases, including CTE, Alzheimer's, Parkinson's, and ALS (and also diseases with no relation to head trauma such as syphilis, Vitamin B12 deficiency, and Lyme disease).[9]

---

[9] The International Statistical Classification of Diseases and Related Health Problems (ICD-10) describes ALS as: "A degenerative disorder affecting upper motor neurons in the brain and lower motor neurons in the brain stem and spinal cord. Disease onset is usually after the age of 50 and the process is usually fatal within 3 to 6 years. Clinical manifestations include progressive weakness, atrophy, fasciculation, hyperreflexia, dysarthria, dysphagia, and eventual paralysis of respiratory function. Pathologic features include the replacement of motor neurons with fibrous astrocytes and atrophy of anterior spinal nerve roots and corticospinal tracts." http://www.icd10data.com/ICD10CM/Codes/G00-G99/G10-G14/G12-/G12.21. Parkinson's is defined as "A progressive, degenerative neurologic disease characterized by a tremor that is maximal at rest, retropulsion (i.e. A tendency to fall backwards), rigidity, stooped posture, slowness of voluntary movements, and a masklike facial expression. Pathologic features include loss of melanin containing neurons in the substantia nigra and other pigmented nuclei of the brainstem. Lewy bodies are present in the substantia nigra and locus coeruleus but may also be found in a related condition (lewy body disease, diffuse) characterized by dementia in combination with varying degrees of parkinsonism." http://www.icd10data.com/ICD10CM/Codes/G00-G99/G20-G26/G20-. Alzheimer's is defined as: "A degenerative disease of the brain characterized by the insidious onset of dementia. Impairment of memory, judgment, attention span, and problem solving skills are followed by severe apraxias and a global loss of cognitive abilities. The condition primarily occurs after age 60, and is marked pathologically by severe cortical atrophy and the triad of senile plaques; neurofibrillary tangles; and neuropil threads. http://www.icd10data.com/ICD10CM/Codes/G00-G99/G30-G32/G30-.

The settlement provides benefits for Alzheimer's, Parkinson's, and ALS, even though the causal connection between those conditions and repeated head trauma from playing NFL football is far weaker than for CTE. *See* A.2273, A.2287, A.2307, A.2314, A.2322, A.2352, A.2388, A.2591 (scientific articles describing association between head trauma and CTE); A.4475, A.4620, A.4754, A.4768, A.4927, A.4953, A.4597, A.5004, A.5058 (declarations of neuroscientists regarding association between head trauma and CTE).

The settlement's treatment of Alzheimer's illustrates the point. Progressively worsening dementia is the primary symptom of Alzheimer's. But the settlement provides a benefit for an Alzheimer's diagnosis regardless of the degree of neurocognitive impairment.  A former player diagnosed with Alzheimer's will be paid a benefit for the disease on top of benefits that may have been paid for mild or moderate dementia.  Moreover, a player definitively diagnosed with Alzheimer's in an autopsy will presumably qualify for benefits even if *no* neurocognitive impairment manifested itself before the player's death.  *See* A.4138 (Hovda Decl. ¶ 24) (there are patients "with Alzheimer's pathology post-mortem that were asymptomatic while alive").

Alzheimer's exists in the general population. A.4475, A.4620, A.4754, A.4768, A.4927, A.4953, A.4597, A.5004, A.5058 (declarations); A.3314 (article discussing evidence of association). When Class Counsel were projecting the cost of settlement benefits, they estimated that there would be twice as many cases among the former NFL players as in the general population. A.1608-11. That means about half of the Alzheimer's cases the settlement is predicted to compensate would be expected regardless of any exposure to repeated head trauma from playing NFL football.[10] CTE, by contrast, is uniquely associated with repeated head trauma. Indeed, "of the neurodegenerative diseases for which head trauma is a risk factor, CTE is the *only* disease that requires head trauma as a necessary condition." A.4424 (Stern Supp. Decl. ¶ 22). Although there are plenty of disputes about CTE, there is no dispute that the causal connection between CTE and football is far more direct than the connection between football and any other diseases compensated under the settlement.

---

[10] That could be an underestimate, "because it is now known that neurologic conditions previously attributed to [Alzheimer's], [Parkinson's], and [ALS] may actually have been related to CTE." A.2398.

## V.   THE COURT SHOULD NOT APPROVE AN UNFAIR AND INADEQUATE SETTLEMENT BECAUSE IT IS SUPPOSEDLY "BETTER THAN NOTHING."

The subtext of the NFL's copious references to its preemption defense (e.g., NFLBR 5-6, 9-11, 27, 31, 45, 48-50, 54) is to encourage the Court to approve even a flawed and unfair settlement because something is better than the nothing the former players would hypothetically get if the District Court were to grant the NFL's motion to dismiss on preemption grounds. That would never be a reason to approve a settlement that did not satisfy Rule 23, but even if it were, the Court should not decide this case on the erroneous premise that the NFL would simply walk away from the settlement table on remand, placing all of its chips on preemption.[11]

The preemption argument was no better than speculative.  The NFL is not a party to the collective bargaining agreements (CBAs), and does not seriously contend that any of the claims here is actually based upon a duty assumed by the NFL under the CBAs between the NFL Players Association and the teams.  *See N.J. Carpenters v. Tishman Constr. Corp.*, 760 F.3d 297, 306 (3d Cir. 2014) (duty to pay fringe benefits arises under state prevailing

---

[11] Economics, not to mention common sense, lead to the same conclusion. The settlement allowed the NFL to dispose—*forever*—of an ominous liability for about 8% of one year of its $12 billion (and growing) annual revenues.  *See*  Http://money.cnn.com/2015/07/20/news/green-bay-packers-revenue/.  It is irrational to suggest that the NFL would pass up variations on that deal, even at higher prices.

wage act, not under the CBA).  Nor is any claim "substantially dependent" upon the disputed meaning of a CBA provision.  *See id.* at 305.

Instead, the NFL advanced the attenuated preemption claim that its duties of care and candor about repeated traumatic brain injury relate in some way to the player safety duties of the NFL teams under the CBAs, and that defining *those* duties calls for interpretation of the CBAs.  ECF Nos. 3589-1 & 4252.  That indirect argument is at most a substantive defense to liability based on the duties of other parties under the CBAs, which is not a basis for preemption.  *Caterpillar Inc. v. Williams*, 482 U.S. 386, 398-99 (1987).

Although a few district courts have accepted the NFL's broad second-order preemption arguments like the one advanced in this case, *see* NFLBR 48-50,[12] those arguments are unsupported by the text of section 301 of the LMRA, 29 U.S.C. § 185(a); the Supreme Court's holdings regarding LMRA preemption; and the rationale for LMRA preemption.  Such an elastic preemption doctrine would produce broad—and unprecedented—immunity for torts against unionized workers, because any tortfeasor could argue that its own duty to avoid harm depended to some degree on the duties of the

---

[12] Some of the decisions cited involve claims against NFL *teams* or the NFL Players Association concerning the performance of duties to players undertaken in the CBAs.

employer or the union under a CBA.  *See Powers v. Cottrell, Inc.*, 728 F.3d 509 (6th Cir. 2013) (no basis for LMRA preemption-based removal of product liability claim against non-party to CBA despite CBA provisions related to safety standards).  Under the NFL's view, such state law tort claims would be preempted, but there would be no tort remedy under federal law.

On its face, LMRA section 301(a) merely confers federal court jurisdiction over "[s]uits for violation of contracts between an employer and a labor organization," which the Supreme Court has held are interpreted according to federal common law.  Tort claims entered the picture only because allowing claims against a party to a CBA based on contractual duties, recast as state-law torts, would undermine the goal of consistent interpretation of CBAs under federal law.  Thus, in *Allis-Chalmers v. Lueck*, 471 U.S. 202, 215-16 (1985), the Court applied LMRA preemption to a bad faith insurance tort claim by an employee against his employer for mishandling disability benefits due under a CBA.  *See also IBEW v. Hechler*, 481 U.S. 851, 862 (1987) ("as in *Allis-Chalmers*, respondent is precluded from evading the pre-emptive force of § 301 by casting her claim [negligence based on a duty the union assumed in the CBA] as a state law tort action."); *United Steelworkers v. Rawson*, 495 U.S. 362, 372 (1990) (tort

23

claim based on duty union assumed under CBA); *Livadas v. Bradshaw*, 512 U.S. 107, 123 (1994) (scope of LMRA preemption assures that the purposes of section 301 will not be frustrated "by parties' efforts to renege on their arbitration promises by 'relabeling' as tort suits actions simply alleging breaches of duties assumed in [CBAs].") (citations omitted).

The former players' tort claims against the NFL in this case are anything but recast contract claims.  Unlike the defendants asserting preemption in *Allis-Chalmers*, *IBEW*, *Rawson*, and *Livadas*, the NFL is not even a party to the CBAs.  The claims are based not on duties the NFL assumed in the CBAs, but rather on duties arising from the NFL's independent control over the conditions of league play and its voluntary (not contractual) role in (mis)informing teams, players, and the public about the risks of head trauma.  Stretching preemption to tort claims with incidental relationships to the duties of *other parties* under a CBA would extend section 301 far beyond even the most flexible reading of the statutory text. This Court, for example, has already rejected the proposition that the fact that a general topic (like player safety) may be a subject of collective bargaining is enough for preemption.  *Kline v. Sec. Guards, Inc.*, 386 F.3d 246, 255-56 (3d Cir. 2004) (citing *Trans Penn Wax Corp. v. McCandless*, 50 F.3d 217, 230-31 (3d Cir. 1995)).

Nor would preemption serve any purpose under the LMRA.  The tort claims against the NFL are not a proper subject of a CBA grievance, so there is no reason to preempt them in order to channel a labor dispute into arbitration.  *See Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 411 (1988).

The point is that LMRA preemption was merely a debatable defense for the NFL.  The same considerations that led the NFL to negotiate the flawed settlement now before the Court are likely to bring the NFL back to the bargaining table.

## CONCLUSION

The District Court's order approving the class action settlement and approving representation of the future claimant subclass should be reversed.

Dated:  October 7, 2015

> Respectfully submitted,
>
> /s/ Dwight P. Bostwick
> Dwight P. Bostwick, Esquire
> ZUCKERMAN SPAEDER LLP
> 1800 M Street, NW, Suite 1000
> Washington, DC  20036
> T: (202) 778-1800
> F: (202) 822-8106
> dbostwick@zuckerman.com

Cyril V. Smith
ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202
T: (410) 332-0444
F: (410) 659-0436
csmith@zuckerman.com

Ramya Kasturi
ZUCKERMAN SPAEDER LLP
399 Park Avenue, 14th Floor
New York, NY 10022
T: (212) 704-9600
F: (212) 704-4256
rkatsuri@zuckerman.com

*Counsel to Appellants Jimmie H. Jones; Ricky Ray; and Jesse Solomon*

George W. Cochran, Esquire
1385 Russell Drive
Streetsboro, Ohio 44241
(330) 626-5600

*Counsel to Appellant Curtis L. Anderson*

## <u>CERTIFICATE OF BAR MEMBERSHIP</u>

I hereby certify pursuant to Local Appellate Rule 46.1 that I was admitted to the Bar of the United States Court of Appeals for the Third Circuit on October 5, 2011, and remain a member in good standing of the Bar of this Court.


/s/ Dwight P. Bostwick
Dwight P. Bostwick, Esquire
Zuckerman Spaeder LLP

*Counsel to Appellant Appellants Jimmie H. Jones; Ricky Ray; and Jesse Solomon*


Dated:      October 7, 2015

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that this brief was produced in Times New Roman (a proportionally-spaced typeface), 14-point type and contains 5,855 words (based on the Microsoft Word word processing system word count function).

I further certify that the electronic copy of this brief filed with the Court is identical in all respects except the signature to the hard copy filed with the Court, and that a virus check was performed on the electronic version using the Norton Anti-Virus software program.

/s/ Dwight P. Bostwick
Dwight P. Bostwick, Esquire
Zuckerman Spaeder LLP

*Counsel to Appellants Jimmie H. Jones;*
*Ricky Ray; and Jesse Solomon*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 7th day of October, 2015, I served the foregoing document by causing a true and correct copy thereof to be delivered via the Court's CM/ECF system to all counsel of record.


/s/ Dwight P. Bostwick
Dwight P. Bostwick, Esquire
Zuckerman Spaeder LLP

*Counsel to Appellants Jimmie H. Jones;*
*Ricky Ray; and Jesse Solomon*